UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|                           |   |                           |
|---------------------------|---|---------------------------|
| JOHN DOE,                 | ) |                           |
|     Petitioner,           | ) |                           |
| v.                        | ) | Civil No. 17-11231-LTS    |
| YOLANDA SMITH et al.,     | ) |                           |
|     Respondents.          | ) |                           |

MEMORANDUM ON PETITION FOR WRIT OF HABEAS CORPUS (DOC. NO. 1)

December 19, 2017

SOROKIN, J.

Congress has granted the Executive Branch broad authority to detain noncitizens facing removal proceedings in order to ensure their appearance in immigration court and availability for removal, as well as to prevent danger to the community. 8 U.S.C. § 1226; Demore v. Kim, 538 U.S. 510, 517-30 (2003). "But that power is subject to important constitutional limitations." Zadvydas v. Davis, 533 U.S. 678, 695 (2001). The Fifth Amendment's prohibition on deprivation of liberty without due process of law means that "the constitutionality of [detaining noncitizens facing removal proceedings] is a function of the length of the detention." Diop v. ICE/Homeland Sec., 656 F.3d 221, 232 (3d Cir. 2011); accord Reid v. Donelan, 819 F.3d 486, 494 (1st Cir. 2016). "Were there to be an unreasonable delay by the [government] in pursuing and completing deportation proceedings, it could become necessary then to inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." Demore, 538 U.S. at 532-33 (Kennedy, J., concurring). There was such a delay here.

John Doe[1] is a citizen of Kenya who was detained for nearly a year, most recently at the Suffolk County House of Corrections in Boston, Massachusetts, while removal proceedings were pending against him. He petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, asserting that his detention violated the Due Process Clause. Doc. No. 1. After the Court denied the respondents' request to dismiss the petition, the parties briefed the merits of Doe's constitutional claims and the Court heard oral argument. On December 7, 2017, the Court entered an Order granting Doe's petition and ordering his release the next day subject to various conditions supervised by the United States Probation Office. Doc. No. 59. This Memorandum explains the Court's reasons for resolving Doe's constitutional claims in his favor and ordering his release.

I. BACKGROUND[2]

Doe lawfully came to the United States from Kenya as a high-school exchange student in 2004, then lawfully returned in 2006 on a student visa to attend Yale University. Doc. No. 1 at ¶ 10; see Doc. No. 21-3 at 2. While he was visiting family in Kenya during winter break in December 2007, two of his loved ones were killed in post-election violence there. Doc. No. 1 at ¶ 10; see Doc. No. 33 at 1-2 (stating Doe "suffered the loss of a child, as well as a close friend"). Doe returned to Yale in January 2008, completed his sophomore year, then studied abroad at the London School of Economics and renewed his student visa during the summer of 2008. Doc. No. 1 at ¶ 10. In March of 2009, Doe was arrested in Connecticut while drunk at a college party; the charges against him were dismissed. Doc. No. 1 at ¶ 11; Doc. No. 21-2 at 3-4. After

---

[1] At the petitioner's request and without objection from the respondents, the Court has permitted the petitioner to proceed in this action under a pseudonym. Doc. No. 3; Doc. No. 15 at 5 n.3; Doc. No. 17.
[2] The facts are derived from the allegations in Doe's habeas petition and documents from the immigration proceedings submitted by the parties in support of their various briefs.

2

struggling with depression in the wake of the losses he had experienced in Kenya, Doe withdrew from Yale in 2010, months before his anticipated graduation. Doc. No. 1 at ¶ 10. He returned to Kenya, sought mental health treatment, and used his computer science training to create an online platform for people seeking justice for loved ones lost to the same post-election violence his family had experienced. Doc. No. 1 at ¶ 10; see Doc. No. 21-3 at 2. Doe's involvement in this cause led to his arrest and torture in April 2013 by individuals associated with the Kenyan government. Doc. No. 1 at ¶ 10; see Doc. No. 21-3 at 3.

In July of 2013, Doe returned to the United States and resumed his studies at Yale. Doc. No. 1 at ¶ 10. He has been in the United States continuously since that time, remaining after his most recent visa expired. Doc. No. 1 at ¶ 10; Doc. No. 21-3 at 3. On March 4, 2014, Doe was arrested in Connecticut and charged with assaulting a female companion. Doc. No. 21-2 at 4; Doc. No. 36-1 at 4; see Doc. No. 1 at ¶ 11. According to Doe, the charges arose from an altercation following his discovery that the alleged complainant had drugged and robbed him with the help of two other women. Doc. No. 36-1 at 4; Doc. No. 1-1 at 14, 16-18, 21-22; see Doc. No. 1 at ¶ 11. The charges against Doe were dismissed. Doc. No. 1 at ¶ 11; cf. Doc. No. 21-2 at 4; Doc. No. 36-1 at 4. Doe graduated from Yale in May of 2014. Doc. No. 1 at ¶ 10. Thereafter, he lived with his brother in Worcester, Massachusetts, and worked as a computer programmer. Doc. No. 1-1 at 15, 24-25; see Doc. No. 15-1 at 3-4.

In November 2016, Doe was charged in New Hampshire with possessing marijuana, disobeying a police officer, and driving without a valid license. Doc. No. 1 at ¶ 11; Doc. No. 21-2 at 4. He was released on bond by the state court, but was detained by Immigration and Customs Enforcement ("ICE") when he appeared for a court date in New Hampshire on

December 19, 2016.  Doc. No. 1 at ¶¶ 9, 11.  The New Hampshire charges remain pending.  Doc. No. 1 at ¶ 11; Doc. No. 21-2 at 4.

Once in immigration custody, Doe requested and received a bond hearing.  Doc. No. 1 at ¶ 13.  Immediately following the January 11, 2017 hearing, the presiding Immigration Judge ("IJ") denied bond, Doc. No. 15-1 at 5, explaining that he "was unable to find that [Doe had] satisfied [his] burden" of "prov[ing] that he [was] not a danger to the community," Doc. No. 21-2 at 2-3.  Doe appealed.  Doc. No. 15-1 at 3.

On March 16, 2017, after a hearing at which Doe testified, the IJ found Doe removable and denied his application for asylum, finding it untimely.  Doc. No. 1 at ¶¶ 6, 9; Doc. No. 33-1 at 2; Doc. No. 33-2 at 3; see Doc. No. 21-3 at 1-2.  However, the IJ granted Doe's application for withholding of removal on two grounds: pursuant to section 241(b)(3) of the Immigration and Naturalization Act ("INA"), and under the Convention Against Torture ("CAT").  Doc. No. 33-1 at 2; Doc. No. 33-2 at 3-4.  In doing so, the IJ concluded that Doe's testimony established "a clear probability that he would be tortured if he were removed to" Kenya.  Doc. No. 21-3 at 2.  Such relief from removal is rarely granted.  See Doc. No. 33 at 3 & nn. 3-4 (citing statistics, which the respondents have not contested, showing CAT withholding is granted in about 1% of cases seeking it, and INA withholding is granted in about 7% of cases seeking it).

The Department of Homeland Security ("DHS") appealed the IJ's order withholding removal.  Although the only Notice of Appeal in the record here is dated March 14, 2017—two days before the IJ held the hearing and issued the ruling being appealed—a BIA filing receipt reflects that the appeal was submitted a month later, on April 17, 2017.  Compare Doc. No. 33-4, with Doc. No. 33-5.  Meanwhile, Doe remained in custody.  On April 25, 2017, Doe sent a motion to the immigration court requesting a custody redetermination and seeking his release,

citing the IJ's decision granting him withholding of removal and responding to the IJ's characterization of his prior arrests that formed the basis for the initial decision to deny bond. Doc. No. 1-1 at 14-25. In the motion, Doe explicitly stated he was "incarcerated in Stafford County Jail, Dover, NH . . . by ICE." Id. at 14. The respondents have neither argued nor submitted evidence that this request for redetermination was ever considered by the IJ or anyone else on behalf of the agency. Cf. Doc. No. 36-1 at 2 (reflecting the IJ did not reference Doe's filing in a later decision regarding bond).

The respondents have submitted evidence that someone acting on their behalf told the IJ that Doe had been released from custody, though he plainly had not been released. At some unidentified point in time after the IJ's decision granting Doe's request for withholding of removal, an unknown representative of DHS erroneously notified the immigration court that Doe had been released by ICE.[3] Doc. No. 36-1 at 2; see Doc. No. 33-7 at 3 (asserting on behalf of DHS that a form "incorrectly indicat[ing] that [Doe] had been released from ICE custody" had been "filed by DHS with the Immigration Court" "[t]hrough inadvertence").

On May 8, 2017, Doe sent a motion seeking summary dismissal of DHS's appeal to the BIA, citing defective service, lack of merit, lack of jurisdiction, and bad faith. Doc. No. 1-1 at 1-13. The motion—a copy of which Doe mailed to DHS at ICE's Office of Chief Counsel in Boston—explicitly referenced Doe's continued detention. Id. at 1, 5, 13. It appears no action was taken as to this motion either. See Doc. No. 1 at ¶ 9. However, two days after Doe sent it, and despite the IJ's decision granting Doe withholding of removal, the BIA affirmed the IJ's

---

[3] The respondents have never identified—in response to a FOIA request by Doe, in their papers filed in this Court, or when asked at oral argument—when this erroneous form was prepared or submitted, how the error was made, who was responsible for making it, the basis for their assertion that it was "inadvertence," or what (if any) efforts DHS has made to prevent such an error from occurring again.

5

January order denying bond, acknowledging the IJ's finding in favor of Doe as to withholding, but concluding the IJ had "properly determined that [Doe] did not meet his burden to establish that he does not pose a danger to the community." Doc. No. 15-1 at 3. In particular, the BIA reasoned that Doe's "lengthy record of arrests, including for the violent offense of assault, demonstrates a disregard for the laws of the United States." Id. Nothing in the BIA's decision reflects an awareness of Doe's motion for a bond redetermination, or of DHS's erroneous notice that Doe had been released. See generally Doc. No. 15-1 at 2-4.

On June 26, 2017, after receiving no response to his filings with the immigration courts, and when there had been no steps taken to prosecute DHS's appeal to the BIA in the two months it had been pending, Doe completed and mailed his pro se federal habeas petition to this Court, Doc. No. 1 at 14; it was received and docketed a week later. In the petition, he asserted substantive and procedural due process claims arising under the United States Constitution and sought release from custody. Id. at 11-13. Pro bono counsel was appointed to represent Doe. Doc. No. 22.

Within days of the docketing of Doe's federal petition, DHS asked the BIA to expedite its appeal in Doe's case, citing Doe's continued detention "at government expense" and referencing the pending habeas petition. Doc. No. 15-2. It then moved to dismiss the federal petition, arguing this Court lacked jurisdiction to consider Doe's challenges to his detention. Doc. No. 14. On July 21, 2017, DHS submitted a motion to the IJ requesting a bond redetermination for Doe. Doc. No. 33-7. In the motion, DHS referenced Doe's unanswered request for such a hearing following the IJ's March decision (evidencing its receipt of Doe's previous motion), noted the pending habeas petition, and appeared to concede that Doe was "eligible for a custody redetermination hearing" as a result of "materially changed circumstances" in the form of the IJ's

6

order granting withholding of removal.  Id. at 3.  The motion also acknowledged DHS's erroneous filing regarding Doe's custody status, and attached a corrected form reflecting that Doe remained detained.  Id. at 3, 5.

On August 8, 2017—more than three months after Doe's request for a new bond hearing, and more than two weeks after DHS sought such a hearing—the IJ issued a notice scheduling a "custody redetermination hearing" for the following week.  Doc. No. 33-8 at 2.  At the hearing on August 16, 2017, Doe was represented by counsel; rather than ruling that day, the IJ took the matter under advisement.  See Doc. No. 33 at 7.

On August 23, 2017—more than four months after the BIA received DHS's notice of appeal, more than three months after Doe moved to have the appeal dismissed, and more than a month after DHS sought expedited consideration of the appeal—the BIA finally set a briefing schedule requiring simultaneous submissions by the parties within twenty-one days, by September 13, 2017.  Doc. No. 33-6.

On September 11, 2017—nearly four weeks after Doe's custody redetermination hearing—the IJ again denied bond in a written decision.  Doc. No. 36-1.  Recounting the procedural history of the matter, the IJ referenced DHS's inaccurate notice regarding Doe's custody status, as well as its subsequent correction of that notice and request for a new bond hearing.  Id. at 2.  The IJ did not acknowledge Doe's earlier request for a new bond hearing.  In explaining his decision to deny bond, the IJ explained that the burden of proof remained on Doe to "establish to the [IJ's] satisfaction that he does not pose a danger to persons or property, is not a threat to national security, and does not pose a flight risk."  Id. at 3.  The IJ discussed Doe's submissions regarding the circumstances of his March 2014 arrest for assault, noted instances in which Doe's submissions did not conclusively confirm his version of events, and concluded:

7

> [T]he Court is not persuaded that [Doe] did not attack [the alleged victims of the 2014 charges]. As such, the Court remains unable to find that [Doe] is not a danger to the community. While the Court recognizes that [Doe] has been detained for a considerable amount of time, the duration of detention is not a factor that the Court may consider when determining if [Doe] should be released from custody. As the Court is unable to find that [Doe] does not pose a danger to the community, his request for release from custody will be denied.

Doc. No. 36-1 at 5 (citation omitted).

Doe submitted his appellate brief to the BIA a day early, on September 12, 2017. Doc. No. 43-1 at 2. Even though DHS had asked the BIA to establish an expedited schedule (and even though it took the BIA four weeks to grant that request), DHS asked for relief from this schedule. The day Doe filed his brief, DHS requested an extension of the briefing deadline, citing "the recent heavy case-load" of the assigned attorney, and providing no insight into how much additional time was necessary. Doc. No. 40-1. The BIA granted an extension, and DHS submitted its brief on October 4, 2017, nearly six months after it submitted its notice of appeal. Doc. No. 43 at 1. The appeal remains pending.

The Court denied the respondents' motion to dismiss Doe's federal petition on October 19, 2017, promptly after briefing was completed, concluding that the petition "plainly presents two federal constitutional claims" which the Court "is empowered – and, indeed, required – to hear." Doc. No. 41 at 7. Merits briefing ensued, and the Court heard oral argument on Doe's claims on December 6, 2017. The next day, the Court entered an Order granting Doe's petition and scheduling his release, under the supervision of the United States Probation Office, for December 8, 2017. Doc. No. 59. Nothing in the Court's Order precluded DHS from detaining Doe after convening after a further bond hearing applying the proper standard. As far as the Court is aware, DHS has not sought another hearing before the IJ.

II.     LEGAL STANDARDS

Doe is detained pursuant to 8 U.S.C. § 1226(a), which permits DHS to detain noncitizens pending removal proceedings.[4] Where detention is not mandatory due to the noncitizen's criminal record or certain other factors, § 1226(c), the decision whether to release a noncitizen on bond or conditional parole while his removal proceedings are pending is within the Attorney General's discretion, § 1226(a). At an initial bond hearing, the immigration courts place the burden of proof on the noncitizen to establish he is neither a danger to the community nor a flight risk. Reid, 819 F.3d at 492; Doc. No. 21-2 at 3. Thereafter, a noncitizen may apply for a bond redetermination if he establishes that his "circumstances have changed materially since the prior bond [decision]," but, even after such a showing, the agency continues to place the burden of proof at any subsequent bond hearing on the noncitizen. See Doc. No. 36-1 at 3.

Doe's case presents constitutional questions in a set of circumstances that are not yet squarely resolved by binding decisions of the First Circuit or the Supreme Court. However, the Supreme Court has explained certain general principles that bear on Doe's claims. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." Zadvydas, 533 U.S. at 690. Civil detention by the government is permitted only "in certain special and narrow nonpunitive circumstances, where a special justification . . . outweighs the individual's constitutionally protected interest in avoiding physical restraint." Id. (quotation marks and

---

[4] Doe has argued his detention should be viewed through the lens of § 1231(a), urging his order of removal is "final" because the only portions of the IJ's order appealed to the BIA were the withholding determinations, not the finding of removability in the first instance. He has cited no case in which any court has entertained, let alone endorsed, this view. Although creative, the Court declines to adopt Doe's perspective as to the appropriate statutory framework for his detention, as it concludes his petition is meritorious even when assessed under § 1226(a).

9

citation omitted). "At the least, due process requires that the nature and duration of [civil detention] bear some reasonable relation to the purpose for which the individual is [detained]." Jackson v. Indiana, 406 U.S. 715, 738 (1972); accord Zadvydas, 533 U.S. at 690. The Supreme Court has "upheld preventive detention based on dangerousness only when limited to specially dangerous individuals and subject to strong procedural protections." Zadvydas, 533 U.S. at 691 (citing cases upholding pretrial detention in the "most serious" cases, with "stringent time limitations, and after requiring "proof of dangerousness by clear and convincing evidence," and striking down "insanity-related detention system that placed burden on detainee to prove nondangerousness"). These basic constitutional guarantees extend "to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." Id. at 693.

In the immigration setting, the Supreme Court, the First Circuit, and many (if not all) other Courts of Appeals to consider the question have "recognized that the Due Process Clause imposes some form of 'reasonableness' limitation upon the duration of detention that can be considered justifiable" under various statutes permitting or requiring detention of noncitizens during or after removal proceedings. E.g., id. at 699; Reid, 819 F.3d at 494; Diop, 656 F.3d at 231; cf. Demore, 538 U.S. at 526, 528 (emphasizing "limited period" and "much shorter duration" of pre-removal detention in rejecting constitutional challenge to statute mandating detention of criminal noncitizens); id. at 532-33 (Kennedy, J., concurring) (warning that additional protections might become necessary if detention became prolonged or proceedings were delayed by the government's actions). Reasonableness is measured "primarily in terms of the [relevant detention] statute's basic purpose." Zadvydas, 533 U.S. at 699; accord Reid, 819 F.3d at 496, 498-99. In the context of mandatory detention of criminal noncitizens facing

removal proceedings, the First Circuit has instructed federal habeas courts considering the reasonableness of a petitioner's detention to examine "the total length of the detention; the foreseeability of proceedings concluding in the near future . . . ; the period of the detention compared to the criminal sentence; the promptness (or delay) of the immigration authorities or the detainee; and the likelihood that the proceedings will culminate in a final removal order." Reid, 819 F.3d at 500.

Other sessions of this Court have granted relief to noncitizens with pending removal proceedings after concluding that their detention by ICE had become unreasonable. See Neziri v. Johnson, 187 F. Supp. 3d 211 (D. Mass. 2016) (Talwani, J.) (finding twenty-seven-month detention unreasonable and ordering bond hearing with burden on DHS to prove dangerousness or risk of flight where criminal noncitizen had appealed an IJ's order of removal to the BIA and then to the First Circuit, where his matter was pending); Reid v. Donelan, 991 F. Supp. 2d 275 (D. Mass. 2014) (Ponsor, J.) (finding fourteen-month detention unreasonable and ordering bond hearing with consideration of alternatives to detention where criminal noncitizen was ordered removed, the BIA remanded, the IJ denied CAT withholding, and the petitioner planned to appeal again to the BIA); Geegbae v. McDonald, No. 10-cv-10852, 2010 WL 4292734, at *1-2 (D. Mass. Nov. 1, 2010) (Tauro, J.) (finding nineteen-month detention unreasonable and ordering release where criminal noncitizen had been awarded "adjustment of status and a waiver of inadmissibility" but remained detained pending DHS's appeal to the BIA); Sengkeo v. Horgan, 670 F. Supp. 2d 116 (D. Mass. 2009) (Gertner, J.) (finding twenty-month detention unreasonable and ordering bond hearing with consideration of conditions and alternatives to detention where criminal noncitizen was granted asylum, DHS appealed, the BIA reversed and remanded for consideration of CAT withholding, and those proceedings remained pending).

11

Finally, federal courts in this District and other jurisdictions have determined that, in some circumstances, due process requires noncitizens whose detention has become unreasonably prolonged to be afforded bond hearings at which DHS bears the burden of proving dangerousness or risk of flight by clear and convincing evidence. Rodriguez v. Robbins, 804 F.3d 1060, 1087 (9th Cir. 2015), cert. granted sub nom. Jennings v. Rodriguez, 136 S. Ct. 2489 (2016); Diop, 656 F.3d at 235; Neziri, 187 F. Supp. 3d at 217 n.6.[5]

From these cases, this Court extracts the following principles which inform its resolution of Doe's claims. First, Doe has a constitutionally protected liberty interest, which strengthens as his detention grows longer. Second, his detention remains reasonable and constitutionally permissible only so long as it bears a reasonable relation to the government's stated purposes for detaining him—here, to protect the community by preventing his commission of any future crimes while his removal proceedings are pending, and to ensure his appearance at future immigration proceedings and his availability for any future removal. Third, if and when his detention becomes so prolonged as to be unreasonable under the circumstances, the Due Process Clause permits continued detention only if it is imposed after affording Doe heightened procedural protections.

---

[5] The Supreme Court is poised to address this question of burden of proof before the end of the Court's current term in Jennings v. Rodriguez, No. 15-1204 (U.S. argued Oct. 3, 2017).

III. DISCUSSION[6]

    A. Reasonableness

Guided by the principles identified above, the Court has little trouble concluding that Doe's detention had become unreasonable by the time the merits of his habeas petition were argued before this Court. At that time, Doe was approaching the one-year anniversary of his arrest by ICE agents in New Hampshire. His removal proceedings "have no foreseeable end," as the law sets no "required deadline for the BIA's decision on the government's appeal," and "[e]ven if the BIA reverses the [IJ's] grant of relief," the matter would likely be "remanded to the [IJ] for a new hearing."[7] Geegbae, 2010 WL 4292734, at *2 & n.26. Doe has no criminal convictions, and no criminal sentence with which to compare the length of his immigration detention.[8]

---

[6] The Court rejects out-of-hand the respondents' suggestion that Doe's claims should be dismissed due to his failure to exhaust them before the BIA. First, the government did not raise exhaustion in its motion to dismiss the petition, where such issues typically are presented. Second, the government concedes that, in this context, exhaustion is not a jurisdictional requirement. See Sengkeo, 670 F. Supp. 2d at 121 ("Exhaustion is not statutorily required when challenging one's detention."). Third, for the reasons urged by Doe, any effort to raise his claims before the BIA would almost certainly be futile, and doing so would subject him to continued incarceration, which "is precisely the harm [he seeks] to avoid." Id. at 122; Doc. No. 51 at 9-11.

[7] The respondents have assured this Court that Doe's removal proceedings are being expedited because he is incarcerated, and that the BIA is likely to issue a decision in his case in the near future. Doc. No. 43 at 1. Doe, on the other hand, points to statistics showing that, on average, it currently takes between one and two years for the BIA to resolve appeals. Doc. No. 49 at 19 n.5. Neither party's view offers any firm basis for predicting when the BIA might render its decision. Doe's statistics may not account for the agency's stated practice of moving more quickly in cases where the noncitizen is detained. The respondents' assurances ignore the fact that the history of this very case presents numerous reasons to doubt whether the agency reliably applies policies and regulations aimed at streamlining proceedings with detained noncitizens.

[8] To the extent his pending New Hampshire charges are relevant to such a comparison, they are misdemeanor offenses for which New Hampshire authorities declined to extradite Doe upon his release by this Court. It is the Court's understanding that, under New Hampshire law, none of the offenses would merit a sentence of more than a year in custody for any defendant, let alone an individual like Doe who does not have any prior criminal convictions. See N.H. Rev. Stat. Ann. §§ 263:64, 265:4, 318-B:2-c, 625:9.

13

Besides applying for withholding of removal, the record contains no hint of any action taken by Doe to prolong his immigration proceedings. See Neziri, 187 F. Supp. 3d at 216 ("[A petitioner] seeking avenues of relief that he is entitled to seek does not exempt his detention from the constitutional requirement of reasonableness."). The same cannot be said about the conduct of DHS. In fact, the record reflects multiple "errors in the proceedings" attributable to the respondents that likely caused "unnecessary delay," and such errors are highly pertinent to assessing the reasonableness of Doe's detention. Diop, 656 F.3d at 234. The Court finds that the following errors and/or inactions by DHS and the immigration courts meaningfully and unreasonably prolonged Doe's removal proceedings:

1) Despite Doe's detention status, DHS waited a full month to file a notice of appeal from the IJ's decision (even though the notice appears to have been prepared before the IJ held a hearing and issued a decision).

2) DHS erroneously informed the immigration court that Doe had been released.[9]

3) Despite Doe's detention status, the BIA did not promptly set an expedited briefing schedule to govern the appeal, as its own regulations require. See 8 C.F.R. § 1003.3(c)(1) ("In cases involving aliens in custody, the parties shall be provided 21 days in which to file simultaneous briefs unless a shorter period is specified by the Board . . . .").[10]

---

[9] Despite the amount of time Doe's habeas petition has been pending and the numerous briefs submitted by both parties here, the respondents' counsel still has not been able to shed any light on when or by whom the erroneous notice was filed, let alone explain how and why the error was made.

[10] Regardless of DHS's submission of a form wrongly stating Doe had been released, it appears the BIA had reason to know—in early May, at least—that Doe remained in custody, as he submitted a pro se motion seeking summary dismissal of the appeal (in which he explicitly referenced his continuing detention), and the BIA denied his bond appeal on the merits (rather than dismissing it as moot).

14

4) No action was taken by the IJ or DHS in response to Doe's motion for a bond redetermination following the IJ's order granting withholding of removal, despite the agency's policy "to favor release of aliens who have been granted protection relief by an immigration judge, absent exceptional concerns."[11] See Doc. No. 49 at 26 n.16 (citing agency memoranda which the respondents concede remain in force).

5) When DHS finally sought an expedited schedule for its appeal after Doe filed his federal habeas petition, the BIA waited a month and a half before setting a twenty-one-day briefing schedule.

6) On the eve of its deadline for filing a brief with the BIA, DHS obtained a three-week extension of time to file its brief. It did so despite Doe's custody status and the delay that already had accrued as a result of DHS's apparent failure to diligently prosecute its appeal and its erroneous belief that Doe had been released.[12]

The sum total of these actions—which demonstrate negligence, at best, on the part of the agency—has transformed a process the Supreme Court has described as typically lasting less than six months, Demore, 538 U.S. at 529, into one that still has not concluded nearly a year after it began. Furthermore, the Court cannot conclude that there is any likelihood the removal proceedings against Doe "will culminate in a final removal order." Reid, 819 F.3d at 500. The

---

[11] DHS later conceded that the IJ's order amounted to a material change in circumstances warranting a new bond hearing, Doc. No. 33-7 at 3, and "eligibility for relief from removal" is among the factors the IJ lists as "significant" to a custody determination, Doc. No. 21-2 at 3; Doc. No. 36-1 at 3.

[12] Some of these actions (and inactions) reflect "ICE's utter disregard for the agency's own procedures." Rombot v. Souza, No. 17-cv-11577, --- F. Supp. 3d ---, 2017 WL 5178789, at *4 (D. Mass. Nov. 8, 2017) (Saris, C.J.). As another session of this Court recently explained, failure to adhere to regulations "promulgated to protect a fundamental right derived from the Constitution"—such as those aimed at expediting proceedings against noncitizens who are being deprived of their liberty—can invalidate agency actions and render detention unlawful. Id.

IJ awarded Doe relief from removal that is rarely granted, after crediting Doe's testimony that he had been tortured in Kenya and concluding he was likely to face torture if he returned there. The IJ found Doe eligible for this relief on two separate statutory bases. There is nothing in the record before this Court suggesting the BIA is likely to win its appeal and then obtain a final order of removal against Doe.

Under these circumstances, having considered the sorts of factors identified by the First Circuit in Reid and the totality of the record developed in this Court, Doe's continued detention no longer is reasonably related to the government's stated, nonpunitive purposes for incarcerating him.[13] See id. at 500.

B. Remedy

The respondents contend that, even if Doe's detention has become unreasonably prolonged, the only appropriate remedy is another bond hearing identical to the two he already had before the IJ. As support, they cite Reid, Neziri, and other cases in this jurisdiction in which noncitizens have lodged successful constitutional challenges to their immigration detention. These cases, the respondents emphasize, culminated in orders requiring bond hearings in the

---

[13] This Court need not identify the moment at which Doe's detention became unreasonable. The Court assumes the agency acted appropriately in detaining him at the outset, and that the IJ applied the correct standards at the initial bond determination. However, at some point between the IJ's ruling granting Doe's application for withholding of removal in March 2017 and now, when DHS's appeal to the BIA has been pending for nearly eight months (and where it languished with no action taken for at least half of that time due to the agency's neglect, or worse), Doe's detention exceeded constitutional bounds.
 It bears noting that ICE is not insulated from all future challenges to the constitutionality of a noncitizen's detention simply because it may have complied with the Due Process Clause when the detention began. The amount of process required to justify civil detention is not static. Changing circumstances and increasing length of detention may alter the constitutional calculus. See Reid, 819 F.3d at 498 (noting claims such as Doe's can present a "moving target" where detention that once was reasonable "may become unreasonable during the pendency of" the relevant proceedings).

immigration court, rather than release of the noncitizen. Doe's claims, however, arise in materially different circumstances and, thus, warrant a different sort of remedy.

First, Doe is not a convicted criminal. He is detained pursuant to § 1226(a), not § 1226(c). The Court has inferred from the legal standards set forth above that unreasonably prolonged detention elevates the level of procedural protections to which a detainee is entitled. For <u>criminal</u> noncitizens subject to <u>mandatory</u> detention, a finding that their detention has become unreasonable elevates the protection to which the Constitution entitles them from <u>no</u> bond hearing at all to a bond hearing before the IJ (where, perhaps, the burden rests with the noncitizen, <u>see</u> <u>Reid</u>, 819 F.3d at 492). But for a <u>noncriminal</u> noncitizen subject to <u>discretionary</u> detention—and particularly one who has prevailed in his application for relief from removal—a finding that his detention has become unreasonable must elevate the protection to which the Constitution entitles him to something beyond the same sort of bond hearing with the same standard that was provided at the outset. This Court concludes, as the Third Circuit in <u>Diop</u> (in a decision discussed favorably by the First Circuit in <u>Reid</u>) and the Ninth Circuit in <u>Rodriguez</u> have concluded, that ICE may continue to detain such an individual only after a bond hearing at which DHS proves dangerousness or risk of flight by clear and convincing evidence. Doe's continued detention is unlawful unless and until DHS makes such a showing as to him—something it has not done to date.

Second, Doe has been granted relief from removal based on the IJ's finding that he faces persecution if he returns to Kenya. The agency's stated policy for more than a decade has been to favor release of such individuals unless "exceptional concerns" exist, such as a threat to national security (<u>which the respondents concede Doe does not present</u>), a legal requirement that the noncitizen be detained (<u>which the respondents concede does not exist here</u>), or danger to the

17

community (which has not been affirmatively established as to Doe).[14]  See Memorandum from Michael J. Garcia, Assistant Secretary, U.S. Immigration and Customs Enforcement, to Anthony Tangeman, Deputy Executive Associate Commissioner, Office of Detention and Removal, *Detention Policy Where an Immigration Judge Has Granted Asylum and ICE Has Appealed* (Feb. 9, 2004).[15]

Finally, the administrative proceedings in Doe's case have been marked by repeated errors suggesting negligence, incompetence, or bad faith on the part of the agency. These errors have prolonged Doe's proceedings and, thus, his detention. According to the respondents' counsel—during oral argument before this Court, and in its written request for an extension of the briefing schedule before the BIA—the immigration courts currently are "flooded" with "heavy case-load[s]." When asked whether the matter could be sent to the IJ with instructions to hold a new bond hearing in a week or less, the respondents' counsel expressed skepticism that the immigration court could act that quickly given its current workload. Where Doe's constitutionally protected liberty interest is being violated by his unreasonably prolonged detention, this Court is not inclined to require him to endure further detention so that the immigration court can endeavor to find time to schedule a constitutionally adequate bond hearing.[16] "Total duration matters to a person held in civil confinement, and due process demands a better answer than 'we haven't gotten around to it yet.'" Reid, 819 F.3d at 499.

---

[14] Although respondents' counsel asserted at oral argument that Doe has been found to be dangerous, that is not an accurate characterization of the IJ's bond determinations. In both of his written decisions, the IJ emphasized the placement of the burden of proof on Doe, concluding that Doe had not proven that he did not present a danger to the community. That is not the same thing as an affirmative finding that Doe presents a danger, let alone an exceptional one.
[15] A copy of this Memorandum is attached hereto as Appendix A.
[16] Nothing about this Court's Order or this Memorandum prevents DHS from seeking, or the immigration court from holding, a constitutionally adequate bond hearing that complies with the parameters set forth in the December 7, 2017 Order. Should such a hearing occur, the

IV. CONCLUSION

For the foregoing reasons, Doe's petition for a writ of habeas corpus was GRANTED, and Doe was released subject to conditions set forth in this Court's December 7, 2017 Order (Doc. No. 59).

       /s/ Leo T. Sorokin
     United States District Judge

---

respondents shall file a copy of the IJ's resulting order in this action so that the Court may consider whether it is appropriate to dissolve the conditions of supervision pursuant to which Doe was released here.